# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ALEXANDER JEROME WILEY,

                              Petitioner,

v.

JON NOBLE,

                              Respondent.

Case No. 21-CV-1037-JPS

**ORDER**

## 1.    INTRODUCTION

On September 7, 2021, Petitioner Alexander Jerome Wiley ("Petitioner") filed a petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2254. ECF No. 1. On April 18, 2022, this Court screened the petition under Rule 4 of the Rules Governing § 2254 cases and set a briefing schedule. ECF No. 4.

On May 16, 2022, Respondent moved to dismiss the petition. ECF No. 7. On November 29, 2022, the Court denied the motion and ordered Respondent to address all three of Petitioner's grounds for relief. ECF No. 11 at 12.

On January 3, 2023, Petitioner filed his brief in support of his petition. ECF No. 15. On February 13, 2023, Respondent filed its opposition to the petition. ECF No. 16. On April 12, 2023, Petitioner filed his reply. ECF No. 21. For the reasons discussed herein, the Court will deny the § 2254 petition.

## 2. BACKGROUND

### 2.1 The Facts Giving Rise to Petitioner's Criminal Case[1]

This § 2254 petition arises out of Petitioner's conviction in Milwaukee County Circuit Court Case No. 2011CF003900.[2] That case arose out of the death of victim Darrin Moore ("Moore"). *State v. Wiley*, 2020 Wisc. App. LEXIS 476, 953 N.W.2d 96, at *1–2 (Wis. Ct. App. 2020). According to the criminal complaint, Moore was shot in the head while driving his van in Milwaukee in early August 2011. *Id*. He was declared dead in the hospital several days later. *Id*. at *2. An investigation led police to question Gerald R. Ray ("Ray"), who told detectives that he and his friend, "Low," had shot at the van. *Id*. An interview with Ray's girlfriend, Shanika Thomas ("Thomas"), revealed that "Low" was Petitioner. *Id*.

### 2.2 Procedural Background

Petitioner was originally charged with first-degree reckless homicide by use of a dangerous weapon as a party to a crime. *Id*. at *1. He entered a plea of not guilty and, by February 2014, the matter proceeded to trial on two charges: the original homicide count, but in the second degree, and an additional count of possessing a firearm as a felon. *Id*. at *2. Petitioner was convicted on both counts and was sentenced to a term of fifteen years of confinement as to the homicide conviction and five years of

---

[1]The following factual background is taken from the Court's order, ECF No. 11, on Respondent's motion to dismiss, ECF No. 7.

[2]*See State of Wisconsin v. Alexander Jerome Wiley,* No. 2011CF003900 (Milwaukee Cnty. Cir. Ct. 2011), *available at* https://wcca.wicourts.gov/caseDetail.html?caseNo=2011CF003900&countyNo=40&index=0&mode=details (last visited May 9, 2023).

confinement as to the felon-in-possession conviction, to operate to run consecutive[3] to each other for a total term of twenty years. ECF No. 4 at 1.

Petitioner appealed his conviction to the Wisconsin Court of Appeals on three grounds: (1) that the introduction of Thomas's testimony against him violated his Sixth Amendment right to confrontation; (2) that his Sixth Amendment right to confrontation was violated when a medical examiner who did not conduct the autopsy on Moore testified as an expert about Moore's cause of death; and (3) that the prosecution failed to present sufficient evidence to prove Petitioner guilty of second-degree reckless homicide beyond a reasonable doubt. *Id*. at 1–2; ECF No. 12-7 at 2. The Wisconsin Court of Appeals didn't bite. ECF No. 12-8 at 2. It first concluded that the circuit court properly admitted Thomas's testimony under Wis. Stat. § 908.01(4)(1)2 as evidence of Ray's prior statement, although it did not explicitly address the federal Confrontation Clause issue. *Id*. at 9. It next concluded that the introduction of expert testimony regarding the cause and manner of Moore's death did not violate Petitioner's federal constitutional right to confront the witnesses against him. *Id*. at 13. Lastly, it concluded that the evidence presented against Petitioner was sufficient to support Petitioner's homicide conviction. *Id.* at 16.

On December 16, 2020, Petitioner petitioned for review by the Wisconsin Supreme Court. ECF No. 12-9. On February 24, 2021, the Wisconsin Supreme Court denied the petition for review. *State v. Wiley*, No. 2018AP164-CR, 2021 Wisc. LEXIS 211 (Wis. Feb. 24, 2021).

---

[3] The Court in its screening order erroneously recited that these terms were to "operate to run concurrent to each other." ECF No. 4 at 1. *See* ECF No. 12 at 1–2 (sentences for Count 1 (Second Degree Reckless Homicide with use of a dangerous weapon as a party to a crime) and Count 6 (Possession of a Firearm by a Felon) were ordered to run consecutively).

In his § 2254 petition, Petitioner raises three grounds for relief. He seeks relief on the grounds that (1) the trial court erroneously permitted a lay witness, Thomas, to give hearsay testimony in violation of his Sixth Amendment right to confront the witnesses against him; (2) he suffered a violation of his Sixth Amendment right to confront the witnesses against him because a medical examiner who did not conduct the autopsy on the homicide victim testified as an expert about the victim's cause of death; and (3) the prosecution failed to present sufficient evidence to prove him guilty of second-degree reckless homicide beyond a reasonable doubt.

### 2.3 Petitioner's Trial

The first witness called at trial was Sergeant Matthew Palmer ("Palmer"), who responded to the scene of the shooting with his partner, Officer Shawn Mahnke ("Mahnke"), roughly one minute after hearing a barrage of gunshots. ECF No. 12-1 at 120–21, 125–26. Palmer testified that he observed Moore inside the vehicle and that Moore had clearly been shot. *Id*. at 123. Palmer described that he and Mahnke located several bullet casings in the area. *Id*. at 125–26.

The State next called Detective James Hensley ("Hensley"). *Id*. at 127. Hensley was dispatched to the scene to investigate. *Id*. at 128. He testified that despite the late hour of the shooting (around 1:00 A.M.), the area was "actually quite well lit" to enable his investigation. *Id*. at 133. Hensley stated that multiple vehicles in the area had "bullet strike[s]" and "shot out" windows, indicating that they had taken fire during the shooting. *Id*. at 124–35, 151. Hensley testified to having recovered from several of those vehicles bullet evidence including a deformed bullet and copper jacketing. *Id*. at 141. Hensley noted that the casings found on the scene were of "two different calibers, which means they were fired by two separate guns." *Id*. at 146. He

specifically identified some of the bullet evidence as coming from a .45 caliber handgun. *Id*. at 159.

The next witness, Dr. Brian Peterson ("Dr. Peterson"), chief medical examiner for Milwaukee County, testified on behalf of the State. *Id*. at 174. He testified as follows:

| | |
|---|---|
| The State: | Doctor, can you tell me what your primary duties are at the Milwaukee County Medical |
| Dr. Peterson: | So a forensic pathologist, just like on television, does autopsies, so I do a lot of autopsies to determine cause and manner of death. But since I'm the chief, I also run the office, testify in court more, do consultation work and go to a lot of meetings. |

. . .

| | |
|---|---|
| The State: | Dr. Peterson, I'm going to be talking to you about an autopsy done on an individual by the name of Darrin Moore. Can you tell me whether or not you, in fact, conducted the autopsy in that manner [sic]? |
| Dr. Peterson: | I did not. Dr. Giese, our fellow, actually performed the autopsy; and she was supervised by Dr. Poulos, who was on our staff at that time.[4] |

. . .

| | |
|---|---|
| The State: | Did you, in fact, have an opportunity to review certain documents in regards to that autopsy? |
| Dr. Peterson: | I did. |

---

[4] The Wisconsin Court of Appeals noted at this point in its recitation of Dr. Peterson's testimony that the "record indicates that, at the time of trial, Dr. Giese was no longer employed by the Milwaukee County Medical Examiner's Office and had moved out of state." ECF No. 12-8 at 4.

| | |
|---|---|
| The State: | And kind of throwing that term out loosely, can you tell me what an autopsy is? |
| Dr. Peterson: | An autopsy is a procedure designed to determine cause of death, which is what actually kills the person, and manner of death, which is how the cause arose. So, for example, in this case, the cause of death is pretty straightforward. It's a gunshot wound to the head. How the gunshot happened is a manner that could be accident, suicide, obviously not natural, or homicide. |
| The State: | Doctor, can you tell us specifically the items that you reviewed in regard to this autopsy? |
| Dr. Peterson: | I reviewed our office's entire file, so that consisted of the autopsy report, the toxicology report; so we have our own drug and alcohol testing lab, so I reviewed their report. We also maintained pictures. This is a newer autopsy, so they were all digital. So the autopsy report, the toxicology report, the pictures, and then we also have an investigative report, so we have a dozen medical, legal, death investigators on our staff. They're the ones that actually go to the scene, bring the body back and so forth. So I reviewed their report, as well. |
| The State: | And are these documents that are generally kept and reviewed in regards to forensic pathology? |
| Dr. Peterson: | Yes. |
| The State: | And do they allow you to make a determination on cause and manner of death? |
| Dr. Peterson: | They do. |
| The State: | And can you tell me whether or not in reviewing these documents you were able to make any findings? |
| Dr. Peterson: | I was. |

| | |
|---|---|
| The State: | And are those findings independent of anyone else's findings? |
| Dr. Peterson: | Well, in the sense that they're my own opinions based on reviewing the facts. Of course, the facts weren't ones I developed on my own. They were developed by the office. But in reviewing those facts, I did reach my own opinion. |
| The State: | And what is your opinion, Doctor? |
| Dr. Peterson: | I have at least a couple. I guess the most important one is that the cause of death in this case is a gunshot wound to the head. The manner of death is homicide. |
| The State: | Let's start with the cause of death. What can you tell us about that based upon your review of these documents? |
| Dr. Peterson: | Mr. Moore sustained a single gunshot wound to the head. It entered about the left temple. It was what you would call an atypical entrance wound. So normally a gunshot wound of entrance is just a round regular hole, think about a bullet hitting square on. In this case it was an irregular unusual looking wound. When that happens, it tells you one of two things must have occurred. Either the bullet hit something else first and became deformed and tumbled as in this case or perhaps ricocheted would be another possibility. So the bullet had to be deformed. What happened here was—and this accompanied other wounds on the fact—the bullet went through glass, specifically side window glass. When that breaks up, you know, we've all seen it—hopefully not on our own cars—it makes those little cubes. When those cubes hit the skin, they cause little right angle cuts called dicing. And Mr. Moore had dicing on his cheek. So entrance wound on temple, dicing on the cheek. What that tells us is as the |

bullet went through glass and as the bullet was hitting his head, the glass was hitting his face. That bullet traveled through his head. There was an exit wound on the right side. Interestingly, associated with the entrance wound was a little bit of bullet about 18 grains worth of some led [sic] and copper, not the whole bullet. Why not the whole bullet? Because it was irregular and tumbling, so part of it broke off. The rest of it exited.

So, in summary, he sustained a single perforated gunshot wound to the head. It went through the window first. There was neither soot nor powder stippling around the entrance wound. That means it's an indeterminate range. So I can't tell you how close the muzzle would have been to his head. It was certainly outside the window. But how close to the window, I have no idea. And so, again, perforated gunshot wound to the head, that was the cause of death, manner of homicide.

The State:        And you said manner of death homicide. What is that based upon?

Dr. Peterson:    The manner of death is—basically rests on the investigation. But in this case, given the nature of the wound, the dicing and so forth, you couldn't do that to yourself. I mean, if a window was up, so the bullet can go through it, you can't have your hand really outside the window and shoot yourself so it couldn't have been a suicide. And as a forensic pathologist— or as forensic pathologist, we use the term homicide simply to mean death by hands of another. It doesn't mean it was a good thing to do or bad thing to do. It just means somebody else did it. So in this case it's a homicide.

The State:        When you make these findings, do you make them to a certain degree?

> Dr. Peterson: The terms we use is within reasonable medical certainty, and that's what these findings are.

ECF No. 12-1 at 175–183. The next witnesses to testify were Detective Matthew Goldberg ("Goldberg") and Detective Ronald Taylor ("Taylor"). *Id.* at 190; ECF No. 12-2 at 7. These witnesses testified regarding their participation in processing vehicles involved in the incident. They described bullet strikes in and on the vehicles as well as bullets and bullet fragments recovered from the vehicles.

The jury next heard testimony from Mark Simonson ("Simonson"), a firearm and tool mark examiner with the State Crime Laboratory. ECF No. 12-2 at 19. Simonson performed an independent investigation of the evidence collected in this case and confirmed that the casings collected at the scene came from more than one gun. *Id.* at 26. He specifically identified ".9 mm caliber cartridge cases," ".45 caliber bullets," ".9 mm bullets," and fragments of both. *Id.* at 22–23. He unequivocally confirmed that the ".45 were fired in one gun, [and] the .9mm were fired in a second gun." *Id.* at 26.

The State then called Devon Sutton ("Devon"), one of Moore's brothers. *Id.* at 40. Devon testified that shots had been fired at the vehicle earlier in the evening, at which time he was a passenger, but that no one was struck at that time. *Id.* at 44. Devon observed two people in the immediate area at that time, one of whom he later identified as Ray. *Id.* at 52, 54; ECF No. 12-3 at 6–7. Devon was in the house later that night when he heard gunshots and discovered Moore's van outside on the street. *Id.* at 46. Devon testified that the passenger side doors were left open, indicating that passengers in Moore's van had fled the scene. *Id.* at 49–50. On cross examination, Devon conceded that Moore had a shotgun, which was later found in the vehicle, and that he and his brothers had gotten into some sort

of verbal altercation with some individuals in the neighborhood earlier that day. ECF No. 12-2 at 57.

Devon's testimony largely tracked that of his brother, Darron Sutton ("Darron"). Darron confirmed that words were exchanged earlier in the day between Moore and some individuals in the neighborhood and that two gunshots were fired in the vicinity when he and his brothers were driving around in the van. *Id*. at 74–78. Darron confirmed that Moore thereafter dropped him and Devon off at the residence and that Moore left with two individuals by the names of Deangelo Copeland ("Copeland") and Mike Hall ("Hall"). *Id*. at 78–79. He confirmed that later that evening, he heard gunshots coming from down the street, and he observed that the passenger side doors on Moore's van were left open. *Id*. at 81.

Copeland testified next. *Id*. at 88. Copeland stated that he, Hall, and Moore had been driving around in Moore's van that evening when they heard gunshots. *Id*. at 89–92. The van crashed, and Copeland observed Moore slumped over in his seat, at which point Copeland fled the vehicle. *Id*. at 93–94. Similarly, Hall testified that he exited the vehicle after Copeland and fled. *Id*. at 101. Neither of the two observed the individuals who had shot at Moore's van. Both confirmed that although there was a shotgun in the van with them, no one used it or even picked it up.

The jury then briefly heard testimony from Lieutenant Paul Lough ("Lough"). Lough testified regarding his participation in a lineup that was conducted on August 17, 2011. ECF No. 12-3 at 4–5. Ray was included in the lineup. Devon identified Ray as having been present at the scene when shots were fired at the van while Devon was a passenger. *Id*. at 6–7.

Ray testified next. *Id*. at 8. Ray confirmed that he was familiar with an individual who went by the nickname "L.O.," and he identified

Petitioner as that individual. *Id*. at 10. He stated that he knew Petitioner from around the neighborhood and that the two had been together off and on during the evening of August 2, 2011. *Id*. at 11. Ray testified that he and Petitioner observed Moore with a shotgun at some point that evening and that Ray told Moore to get out of the area. *Id*. at 12–13. At the time of this interaction, Ray had a .45 caliber handgun on him, which he showed to Moore. *Id*. at 14–15. Ray observed Moore leave the area in a van at that time. *Id*. at 16. The van returned to the area shortly thereafter, however, and Ray fired his gun into the air two times as a warning. *Id*. at 20, 23.

Ray testified that the van came back into the area again later that evening and that he began shooting at it, at which point Petitioner began shooting at it, too. *Id*. at 23–29. Ray estimated that he directed eight shots towards the van. *Id*. at 29. He could not see what type of gun Petitioner had during the shooting, but he noticed afterwards that it was a 9 millimeter handgun. *Id.* at 31. Ray testified that he and Petitioner fled the scene in different directions after Moore's van crashed into parked cars. *Id*. at 30.

Sometime after the shooting, Ray confided in Thomas, his then-girlfriend and the mother of his child, regarding what had occurred. *Id*. at 33. But Thomas spoke with police, and Ray was arrested roughly a week after the shooting. *Id*. at 35. At first, Ray denied any involvement, but after four days in custody he admitted to his participation in the shooting. *Id*. at 37. He also informed the police of Petitioner's involvement, although he identified Petitioner only by his nickname, L.O. *Id*. at 38.[5]

---

[5] Ray was vigorously cross-examined. Defense counsel attempted to diminish Ray's credibility in part by having Ray acknowledge the deal he had with the State to testify in exchange for the opportunity to plead guilty to a reduced charge. ECF No. 12-3 at 40. Defense counsel also impeached Ray repeatedly, referring back to transcripts from police interviews wherein Ray had stated that

Thomas testified next. ECF No. 12-4 at 9. She confirmed that Ray did eventually inform her that he and "L.O." had been involved in the shooting. *Id.* at 11. She described that Ray "felt threatened" upon seeing Moore with the shotgun and so Ray "and his friend started to retaliate back, like shoot." *Id.* at 12. Thomas confirmed that she was familiar with "L.O." through his association with Ray, and she identified L.O. in the courtroom as Petitioner. *Id.* at 13–15. According to Thomas, Ray had told her it was Petitioner's idea to shoot at Moore's van. *Id.* at 18.

The jury then heard testimony from Tyrese Williams ("Tyrese"). *Id.* at 31. He testified to having heard the shots on August 2, 2011. *Id.* at 33. The State asked Tyrese whether he recalled telling a detective named Billy Ball ("Ball") that Ray and Petitioner had knocked at his door shortly before the shooting saying that they "needed to get their stuff." *Id.* at 34, 37. Tyrese insisted that he didn't remember and that there was "[n]obody at [his] house." *Id.* He also denied the State's assertion that he had "identif[ied] the two individuals through a picture." *Id.* at 37. The Court explicitly noted, outside of the presence of Tyrese and the jury, that Tyrese's demeanor was "very poor" and that it was "possible that he was lying." *Id.* at 72–73.

Tyrese's mother, Tiffany Williams ("Tiffany"), testified next. *Id.* at 38–39. She denied hearing or seeing the shooting on August 2, 2011. *Id.* at 40. She did testify, however, that at some point that evening, her son "let her know that someone was there" at the house. *Id.* She thereafter heard two voices, and according to the State, she told Ball that she was "very familiar with those voices" and recognized them from the neighborhood. *Id.* at 41. But at trial, Tiffany denied recognizing the voices. *Id.* She claimed

---

he thought Petitioner had a .45 millimeter handgun, not a 9 millimeter handgun. *Id.* at 83.

that she identified the individuals through "some pictures that [Ball] showed [her] but not with the voices." *Id*. at 43. She then identified Petitioner in the courtroom as someone with whom she was familiar from the neighborhood. *Id*. at 43–44.

Tamia Williams ("Tamia") then testified. *Id*. at 49. Like Tyrese, she denied having told Ball that Petitioner and Ray had knocked on the door that night. *Id*. at 50–51. She claimed to have heard two individuals' voices but denied seeing them. *Id*. at 52. Like Tiffany, she identified Petitioner in the courtroom as someone with whom he was familiar from the neighborhood. *Id*. at 53.

The State then called Ball as its last witness. *Id*. at 55. He confirmed that he interviewed Tyrese, Tiffany, and Tamia as part of the investigation into Moore's death. *Id.* at 56. Ball testified that when he spoke with Tyrese, Tyrese identified the two individuals who showed up at his house on the night of the shooting as "Fat Man" and "L.O."—the nicknames of Ray and Petitioner. *Id*. at 57. Ball testified that he showed Tyrese photos of Petitioner and of Ray at that time, and Tyrese identified them as the individuals he saw that night. *Id*. at 58. Ball then identified Petitioner in the courtroom as the individual that Tyrese identified in the photo. *Id*. According to Ball, Tyrese told him that Ray and Petitioner showed up at the house saying they needed to get "some bullets" out of the basement and that Tyrese and Tamia heard gunshots later that evening. *Id*. at 59–60, 63.

Similarly, Ball testified that Tiffany recognized the voices of the two individuals that night as those of Petitioner and Ray and that she also recognized those individuals in the photos Ball showed her. *Id.* at 61. Ball also testified that Tamia told him she went out on the stairwell landing and observed Petitioner and Ray outside the door that night, and she confirmed

Case 2:21-cv-01037-JPS   Filed 05/09/23   Page 13 of 30   Document 22

their identities when shown photos. *Id*. at 62. Ball confirmed that when he spoke with Tyrese, Tamia, and Tiffany, he did not provide the names of Ray and Petitioner and that those witnesses proffered the names. *Id*. at 63. Following Ball's testimony, the State rested its case in chief.

The defense offered two witnesses. First, the defense called Detective Jeremiah Jacks ("Jacks"), a homicide detective. *Id*. at 74–75. Jacks testified solely regarding a different criminal investigation in which Ray made, and later recanted, accusations against another individual and in which Ray was anticipated to serve as a witness at trial. *Id*. at 75–78 (Q: "And at that point he said I did write the letter but the letter was—was a lie?" A: "Correct."). Lastly, the jury heard testimony from Ryan Carpenter ("Carpenter"), a police officer. *Id*. at 79–80. He, too, testified solely regarding Ray—specifically, that Ray had attempted to evade arrest for his participation in the shooting. *Id*. at 80–82.

### 3. STANDARD OF REVIEW ON HABEAS

State criminal convictions are generally considered final. Review may be had in federal court only on limited grounds. To obtain habeas relief from a state conviction, 28 U.S.C. § 2254(d)(1) (as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA")) requires the petitioner to show that the state court's decision on the merits of his constitutional claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Brown v. Payton*, 544 U.S. 133, 141 (2005). The burden of proof rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The relevant decision for this Court to review is that of the last state court to rule on the merits of the petitioner's claim. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006).

A state-court decision runs contrary to clearly established Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [those] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown*, 544 U.S. at 141. Similarly, a state court unreasonably applies clearly established Supreme Court precedent when it applies that precedent to the facts in an objectively unreasonable manner. *Id.*; *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013).

The AEDPA undoubtedly mandates a deferential standard of review. The Supreme Court has "emphasized with rather unexpected vigor" the strict limits imposed by Congress on the authority of federal habeas courts to overturn state criminal convictions. *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011). It is not enough for the petitioner to prove the state courts were wrong; he must also prove they acted unreasonably. *Harrington v. Richter*, 562 U.S. 86, 101 (2005); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) ("An 'unreasonable application of' federal law means 'objectively unreasonable, not merely wrong; even 'clear error' will not suffice.'") (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)).

Indeed, the petitioner must demonstrate that the state court decision is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (quoting *Harrington*, 562 U.S. at 102). The state court decisions must "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *Hartjes v. Endicott*, 456 F.3d 786, 792 (7th Cir. 2006). Further, when a state court applies general constitutional standards, it is afforded even more latitude under the AEDPA in reaching decisions based on those standards. *Knowles v.*

*Mirzayance*, 556 U.S. 111, 123 (2009); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

As the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Indeed, Section 2254(d) stops just short of "imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *See id.* This is so because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

A federal court may also grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). The underlying state court findings of fact and credibility determinations are, however, presumed correct. *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013). The petitioner overcomes that presumption only if he proves by clear and convincing evidence that those findings are wrong. 28 U.S.C. § 2254(e)(1); *Campbell*, 770 F.3d at 546. "A decision 'involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence.'" *Bailey*, 735 F.3d at 949–50 (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (quoting *Wood v. Allen*, 558

U.S. 290, 301 (2010)). If shown, an unreasonable factual determination by the state court means that this Court must review the claim in question *de novo*. *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008). A federal court also reviews a claim *de novo* where the state courts failed to "reach the merits" of the federal constitutional claim entirely. *See Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings' . . . . Instead, the claim is reviewed *de novo*.").

4.   **LAW & ANALYSIS**

   **4.1   Ground One**

Petitioner's first ground for relief is that the trial court erroneously permitted a lay witness, Thomas, to give hearsay testimony in violation of his Sixth Amendment right to confront the witnesses against him. Respondent argues that this ground is "procedurally defaulted" because although Petitioner "used the word 'confrontation' in the Wisconsin Court of Appeals with respect to the title of this claim, he did not use that word in the Wisconsin Supreme Court." ECF No. 12 at 2; ECF No. 16 at 10.

To reiterate, Respondent's motion to dismiss asserted that Ground One was "not cognizable in habeas corpus" because it "is a claim regarding a state law evidence rule." ECF No. 8 at 2. Respondent alleged that the "state law evidence rule was all he argued in state court, so no Confrontation Clause claim as to Thomas's testimony is exhausted." *Id*.

The Court rejected that argument, concluding that Petitioner fairly presented Ground One to the Wisconsin Court of Appeals and noting that there appeared to be inconsistency between Respondent's motion and its brief such that the ground(s) on which Respondent moved to dismiss

Ground One were unclear. ECF No. 11 at 7 ("As the Court understands it, Respondent seems to argue that Ground 1 involves only state law evidence rules, and that it is accordingly not cognizable for habeas purposes. Alternatively, Respondent seems to argue that if the Court interprets Petitioner's Ground 1 as relating to a violation of his right to confrontation, the Court should find that ground as being unexhausted.").

Respondent now argues that Ground One is procedurally defaulted (although the substance of his argument appears to be based on exhaustion) because Ground One was not "fairly presented" to both the Wisconsin Court of Appeals *and* the Wisconsin Supreme Court. ECF No. 16 at 11 ("Petitioner presented the operative facts relating to Ground One to both the Wisconsin Court of Appeals and the Wisconsin Supreme Court . . . [b]ut Petitioner did not present either court with the substance of the Confrontation Clause issue he asserts in ground One. . . . 'A mere "passing reference" to a constitutional issue certainly does not suffice.'").

The Court already concluded in its order on Respondent's motion to dismiss that Petitioner fairly presented Ground One to the Wisconsin Court of Appeals. *See* ECF No. 11 at 8 ("In its reply, Respondent concedes that Petitioner invoked the 'Sixth Amendment' and his right to confrontation in his briefing to the Wisconsin Court of Appeals.") and at 11 ("Petitioner's briefing before the Wisconsin Court of Appeals was 'sufficient to put the state court on notice' that he was seeking relief on the ground that his Sixth Amendment right to confrontation was violated by the admission of Thomas's allegedly improperly admitted testimony."). The Court already made a clear, unequivocal determination on the issue of whether Ground One was fairly presented to the Wisconsin Court of Appeals. Respondent has never sought reconsideration of that determination. It is unclear why

Respondent is acting as if that conclusion had never been reached and as if he himself had not already argued it before.[6]

But in any event, the conclusion that Petitioner did not fully and fairly present Ground One to the Wisconsin Supreme Court and is therefore unexhausted and, subsequently, procedurally defaulted, appears to be correct. "[E]xhaustion of state remedies requires that petitioners 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan*, 513 U.S. at 365 (quoting *Picard*, 404 U.S. at 275). A review of Petitioner's petition for review to the Wisconsin Supreme Court leads the Court to conclude that Petitioner failed to fairly present Ground One of his § 2254 petition to that court.

In his petition for review to the Wisconsin Supreme Court, Petitioner described what is now Ground One as whether "Thomas's testimony [was] admissible to rebut a charge of recent fabrication where the motive to lie predates, and was demonstrated by, Thomas's statement." ECF No. 12-9 at 2. He also described it as whether "Thomas's statement [was] admissible as a prior consistent statement where [Ray's] motive to lie prior to speaking with her and [sic] was demonstrated in her statement[.]" *Id*. at 4. Petitioner insists that he "appealed to the Wisconsin Supreme Court on the same three claims" presented to the Wisconsin Court of Appeals, but that is not entirely accurate. ECF No. 15 at 3. In contrast to his briefing to the Wisconsin Court of Appeals, Petitioner did not in his petition to the Wisconsin Supreme

---

[6]Even the pro se Petitioner—a non-lawyer with more limited access to legal materials—was able to identify this issue. *See* ECF No. 21 at 3 ("The Respondent is arguing that Wiley failed to present the substance of Ground One to the Wisconsin Appellate Court, except the court has already determined that Ground One was properly preserved . . . .").

Court reference the Confrontation Clause or the Sixth Amendment with respect to that ground.[7] And so, while Petitioner fairly presented Ground One to the Wisconsin Court of Appeals, ECF No. 11 at 11, he did not do so to the Wisconsin Supreme Court.

Moreover, Petitioner would not be able to successfully return to the state courts to exhaust this ground, and it is therefore procedurally defaulted. This conclusion bars a merits review of Ground One, but it does not prevent the Court from addressing the merits of the remaining grounds for relief. "[I]ssues previously considered on direct appeal cannot be collaterally reviewed pursuant to a motion under sec. 974.06 . . .; for this reason, the [mixed petition] rule of *Rose v. Lundy* does not bar the present petition." *Morales v. Kolb*, No. 87-C-943, 1987 U.S. Dist. LEXIS 17265, at *2 (E.D. Wis. Dec. 9, 1987) (emphasis added).[8] "If a federal court that is faced with a mixed petition determines that the petitioner's unexhausted claims would now be procedurally barred in state court 'there is a procedural default for purposes of federal habeas' . . . . [and] instead of dismissing the entire petition, the court can deem the unexhausted claims procedurally

---

[7]Petitioner asserts in his reply, ECF No. 21 at 4, that he "mentions the confrontation one time in the petition of review" to the Wisconsin Supreme Court, but he includes no citation to his petition for review to support that assertion, and the Court's review of the petition belies it. Petitioner's petition for review to the Wisconsin Supreme Court references the confrontation issue with respect to Ground Two, but not with respect to Ground One.

[8]Were Petitioner to return to the state courts to attempt to present Ground One properly, the state courts would certainly deem the ground procedurally barred for Petitioner's failure to present it properly in the first instance. *See State v. Escalona-Naranjo*, 517 N.W.2d 157, 158–59, 164 (requiring a sufficient reason to raise a constitutional issue in a sec. 974.06 motion that could have been raised on direct appeal or in a sec. 974.02 motion) (Wis. 1994); *see also Carr v. Wisconsin*, No. 21-CV-492-JDP, 2023 WL 2327970, at *5 (W.D. Wis. Mar. 2, 2023). Petitioner does not appear to have any such sufficient reason.

barred and address the properly exhausted claims." *Footenot v. Crow*, 4 F.4th 982, 1019 (10th Cir. 2021) (internal citations omitted). The Court will do so.

### 4.2 Ground Two

Petitioner's second ground for relief is that he suffered a violation of his Sixth Amendment right to confront the witnesses against him because a medical examiner who did not conduct the autopsy on Moore testified as an expert about Moore's cause of death. In opposition to this ground, Respondent argues that "[t]he Confrontation Clause was not violated because Dr. Peterson testified as to his independent opinion, not another person's opinion." ECF No. 16 at 18.

The Wisconsin Court of Appeals concluded that Dr. Peterson's testimony about the cause and manner of Moore's death did not violate Petitioner's constitutional right to confront the witnesses against him. ECF No. 12-8 at 13. The Wisconsin Court of Appeals explicitly referenced the Confrontation Clause of the Sixth Amendment to the United States Constitution, but it relied on state law interpretations thereof. *Id*. The court relied specifically on *State v. Griep*, 863 N.W.2d 567 (Wis. 2015) and *State v. Williams,* 644 N.W.2d. 919 (Wis. 2002). *Id*. *Griep* recited *Williams*'s prior holding that the "presence and availability for cross-examination of a highly qualified witness, who is familiar with the procedures at hand, supervises or reviews the work of the testing analyst, and renders her own expert opinion is sufficient to protect a defendant's right to confrontation, despite the fact that the expert was not the person who performed the mechanics of the original test." *Griep*, 863 N.W.2d 567, ¶ 20. Put otherwise, "an expert's testimony satisfies the defendant's right of confrontation if the testifying expert has '(1) reviewed the [original analyst's] tests, and (2) formed an independent opinion to which he [or she] testified at trial.'" ECF

No. 12-8 at 14 (quoting *Griep*, 863 N.W.2d 567, ¶ 47). Finding those requisites met in the case at bar, and noting that the doctor who performed the autopsy, Dr. Giese, was no longer employed with the Milwaukee County Medical Examiner's Office and had in fact moved out of state, ECF No. 12-8 at 4 n.3, the Wisconsin Court of Appeals rejected Ground Two. The Wisconsin Court of Appeals neither made an unreasonable determination of the facts in light of the evidence presented nor ruled contrary to clearly established Supreme Court precedent in rejecting that ground.

A discussion of relevant Confrontation Clause precedent becomes necessary. In *Bullcoming v. New Mexico*, 564 U.S. 647, 657 (2011), the Supreme Court of the United States addressed whether "the Confrontation Clause permit[s] the prosecution to introduce a forensic laboratory report containing a testimonial certification, made in order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification." The Court answered that question in the negative, posing the following hypothetical: "Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures?" *Id*. at 660. "As our precedent makes plain," the court continued, "the answer is emphatically 'No.'" *Id*. It stated that the "surrogate testimony of the kind the [witness] was equipped to give could not convey what [the performing analyst] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed." *Id*. at 661. And importantly, the court noted that the "State never asserted that [the performing analyst] was unavailable . . . .

Nor did the State assert that the [witness] had any 'independent opinion' concerning [defendant's] BAC." *Id.* at 662.

Similarly, Justice Sotomayor stressed in her concurrence that this was "not a case in which the person testifying [was] a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue" and was "not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id.* at 672–73. "As the Court notes," Justice Sotomayor continued, "the State does not assert that [the witness] offered an independent, expert opinion about [the defendant's] blood alcohol concentration. Rather, the State explains, '[a]side from reading a report that was introduced as an exhibit, [the witness] offered no opinion about Petitioner's blood alcohol content . . . .'" *Id.* at 673.

The case before the Court presents those distinguishing aspects noted by the court in *Bullcoming*, emphasized in the concurrence by Justice Sotomayor, and further identified in federal authority expanding on the Supreme Court's Confrontation Clause precedent.[9] The First Circuit in *Nardi v. Pepe*, 662 F.3d 107 (1st Cir. 2011), for example, found no Confrontation Clause violation after a medical examiner (who did not perform the relevant autopsy) testified at trial regarding the victim's cause of death. The First Circuit noted that the doctor who performed the

---

[9]Circuit, rather than Supreme Court, precedent does not in and of itself constitute "clearly established" federal law for purposes of habeas corpus, but it nevertheless may help guide the inquiry. *See Lewis v. Zatecky*, 993 F.3d 994, 1000 (7th Cir. 2021) ("For purposes of section 2254(d), the only relevant law is that which is 'clearly established Federal law, as determined by the Supreme Court of the United States[.]' . . . . Our own decisions, as well as those of other circuits or state courts, are informative only insofar as they may shed light on our understanding of the authoritative Supreme Court precedents.").

autopsy, Dr. Weiner, had retired out of state and was unable to return to testify. *Id*. at 109. A different doctor, Dr. McDonough, who "had extensive experience as a medical examiner but no involvement in [the victim's] autopsy," testified instead. *Id*. "Before testifying, Dr. McDonough reviewed Dr. Weiner's autopsy report, as well as autopsy photographs, tissue slides and a toxicology report, and formed what he described as his own opinion about the cause of [the victim's] death." *Id*. Under these circumstances, no Confrontation Clause violation had occurred.

The same is true here. Dr. Peterson testified regarding his own independent, expert opinion based on his review of the entire file, which included the autopsy report, toxicology report, investigative report, and photos. ECF No. 12-1 at 180 (Q: "And are those findings independent of anyone else's findings?" A: "Well, in the sense that they're my own opinions based on reviewing the facts."). He testified that, in his opinion, the cause of Moore's death was "pretty straightforward," and he explained his reasoning for so opining. *Id*. at 179. He testified that the cause of Moore's death was, in his opinion, a homicide and, specifically, a gunshot wound to the side of the head, because the bullet had come through the vehicle's window before striking Moore, meaning that Moore could not have shot himself. *Id*. at 181–83. Dr. Peterson did not merely recite Dr. Giese's conclusions from the autopsy report. And as Chief Medical Examiner, Dr. Peterson could speak to the "particular . . . process" employed in the autopsy procedure. *Bullcoming*, 564 U.S. at 661; ECF No. 12-1 at 175–76 ("I do a lot of autopsies to determine cause and manner of death . . . . We do about a thousand autopsies a year for Milwaukee County."). In light of the foregoing, Dr. Peterson cannot be described as providing merely "surrogate testimony." *Id*. Moreover, unlike in *Bullcoming* and like in *Nardi*, the doctor

who performed the autopsy in this case was explicitly acknowledged as being unavailable to testify.

For these reasons, the Wisconsin Court of Appeals did not rule contrary to established Supreme Court precedent in concluding that Dr. Peterson's testimony did not run afoul of the Confrontation Clause.[10]

### 4.3    Ground Three

Petitioner's third ground for relief is that the prosecution failed to present sufficient evidence to prove him guilty of second-degree reckless homicide beyond a reasonable doubt. In addressing this ground, the Wisconsin Court of Appeals began by reviewing the elements required to be proven for the crimes charged: "Before the jury could find Wiley guilty of second-degree reckless homicide by use of a dangerous weapon as a party to a crime, the State was required to prove beyond a reasonable doubt that: (1) Wiley caused Moore's death; (2) by criminally reckless conduct; (3) while using a dangerous weapon; and (4) he either directly committed the crime or aided and abetted the person who committed it." ECF No. 12-8 at 16. The Wisconsin Court of Appeals also noted that its "review is highly deferential to the jury's verdict." *Id*. (citing *State v. Beamon*, 830 N.W.2d 681 (Wis. 2013)).

The Wisconsin Court of Appeals was "not persuaded" by this ground, noting that the conviction was supported by the testimony of Dr. Peterson regarding the cause and manner of death; the testimony of Ray, who pleaded guilty to the crime and conceded that he and Petitioner had shot Moore; the testimony of two witnesses who had been passengers in the

---

[10]Having resolved the analysis on this ground, the Court need not address Respondent's alternative argument that the autopsy's findings were not testimonial to begin with and could not, therefore, implicate the Confrontation Clause. ECF No. 16 at 21.

Case 2:21-cv-01037-JPS    Filed 05/09/23    Page 25 of 30    Document 22

vehicle at the time of the shooting; and the testimony of a detective who "identified the bullet fragment that was removed from Moore's left temple." *Id*. at 16, 19. That conclusion neither constituted an unreasonable determination of the facts nor ran contrary to Supreme Court precedent.

In *Herrera v. Collins*, 506 U.S. 390, 401 (1993), the United States Supreme Court confirmed that a "federal habeas court may review a claim that the evidence adduced at a state trial was not sufficient to convict a criminal defendant beyond a reasonable doubt." But the Court emphasized that the relevant question in that inquiry was "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. at 401–02 (quoting *Jackson*, 443 U.S. at 319). Importantly, this standard "does not permit a court to make its own subjective determination of guilt or innocence." *Id*. at 402 (quoting *Jackson*, 443 U.S. at 320, n.13). The Supreme Court reiterated these concepts in *Coleman v. Johnson*, 566 U.S. 650, 651 (2012), where it emphasized that claims of insufficiency of the evidence face a high bar in habeas proceedings because it is the responsibility of the jury, not the court, to decide what inferences to draw from the evidence. (citation omitted).

Petitioner argues that the State failed to prove his involvement in Moore's death. ECF No. 15 at 23.[11] He asserts that Ray was "thoroughly

_____

[11]Petitioner also argues that the State failed to prove that "Mr. Moore's death was a homicide." ECF No. 15 at 24. But having reached the conclusion that

discredited on the stand" and that Tyrese, Tiffany, and Tamia "all denied having any recollection of seeing either Wiley or Ray." *Id*. at 23–24. At best, Petitioner argues, the evidence presented could have put him and Ray "together before the shooting, not at the time of it." *Id*. at 24.

There is no question that Ray was far from being the most credible witness the trial court had ever seen. He admitted to lying dozens of times. He admitted to falsely implicating another individual in a different case and thereafter recanting. ECF No. 12-3 at 92. He conceded that he was testifying for the State in exchange for the opportunity to plead guilty to a reduced charge. *Id*. at 40. He conceded that he implicated Petitioner in part because the "detectives just kept saying Lo." ECF No. 12-3 at 103.

But he also testified that Petitioner was, indeed, the individual who shot at Moore's van with him, *id*. at 104, and in any event, the fact that a witness is testifying pursuant to a cooperation agreement and that his testimony is, in fact, inconsistent, does not necessarily mean that it has no evidentiary value. *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[E]ven though each of the Government witnesses . . . had pled guilty . . . and testified pursuant to cooperation agreements with the Government and even though their testimony was pock-marked with inconsistencies, at this stage we credit what they said."). Ultimately, issues of credibility and conflicting testimony are best evaluated in the first instance by the trier of fact. Federal habeas review is not the appropriate forum for reevaluating credibility determinations. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)

---

Dr. Peterson's testimony regarding the cause and manner of Moore's death did not run afoul of the Confrontation Clause, and taking into account, *inter alia*, Palmer's testimony that he observed Moore apparently deceased in the driver's seat of the van "quite obviously ha[ving] been shot," ECF No. 12-1 at 123, the Court finds this argument to be entirely without merit.

("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

And notwithstanding the issues with Ray's credibility, various other witnesses were alleged to have identified both Ray and Petitioner as being in the area that night and entering a house to "get something out of the basement" shortly before the shooting. *See* ECF No. 12-4 at 59. Petitioner insists that, at best, this places him with Ray prior to the shooting, but not at the shooting itself. ECF No. 15 at 24. But the jury was allowed to draw the reasonable inference that Ray and Petitioner participated in the shooting, which occurred shortly after they appeared at a residence allegedly stating that they "needed to get some bullets." ECF No. 12-4 at 59. Petitioner points to the fact that neither Tyrese, Tiffany, nor Tamia testified to having seen him that night, but Ball's testimony flatly contradicted their version of events. The jury was apparently more convinced by Ball's testimony than by that of Tyrese, Tiffany, and Tamia, and this Court is obligated to defer to the jury's assessment of the weight of competing evidence and the credibility of these witnesses.

"The jury in this case was convinced, and the only question . . . is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656. It was not. In light of the foregoing, and having reviewed the entirety of the trial transcript, the Court cannot conclude that no rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.

**5. CONCLUSION**

As discussed above, Petitioner's first ground for relief fails for procedural default, and his remaining grounds for relief are without merit. The Court must therefore deny his petition.

Under Rule 11(a) of the Rules Governing Section 2254 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), a petitioner must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). No reasonable jurists could debate whether the petition has merit. The Court must, therefore, deny Petitioner a certificate of appealability.

Accordingly,

**IT IS ORDERED** that Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, ECF No. 1, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 9th day of May, 2023.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.